# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

**SHAYONNA FEATHERSTONE, et al.** *

**Plaintiffs** *

v. *

**Case No. ____________**

**KENNEDY KRIEGER INSTITUTE, INC.** *

**Defendant.** *

***************************************************************************

**AFFIDAVIT OF MERRILL BROPHY IN SUPPORT OF NOTICE OF REMOVAL**

I, the undersigned, am over the age of eighteen, am competent to testify and have personal knowledge of the following:

1. I, Merrill Brophy, was employed by the Kennedy Krieger Institute ("Kennedy Krieger") until 2002, when I retired.

2. In the fall of 1993 I became involved with the National Institute of Environmental Health Sciences ("NIEHS") study - Treatment of Lead-Exposed Children ("TLC"). My involvement at Kennedy Krieger was with J. Julian Chisolm, M.D. I served as project manager for the portion of the TLC study conducted at Kennedy Krieger.

3. In my role as project manager I have obtained first-hand knowledge regarding activities of the NIEHS and its officers as well as the CDC, related to the design and implementation of the TLC study. The contract for the TLC study was drafted and prepared by NIEHS without any involvement from Kennedy Krieger.

4. A group consisting of, among others, the NIEHS Project Officer and the Principal Investigators from the Clinical Centers, was charged with responsibility for virtually all aspects of the TLC study, including, the design and implementation of the protocol, enrollment of study

participants, and follow up. This group held regular meetings and/or conference calls in fulfillment of that responsibility. Also participating in those meetings and calls were various other individuals from NIEHS and the clinical centers who were involved with this study. I was one such participant. Those meetings were supervised by the NIEHS Project Officer, Dr. Walter Rogan. Dr. Rogan actively participated in the discussions, and guided the direction of the Steering Committee meetings to ensure that the TLC study plans developed consistent with NIEHS objectives.

5. During the Steering Committee meetings, there was active discussion from all interested participants. However, the only way for a substantive TLC study decision to be implemented and become part of the study, was following review by NIEHS. Each and every decision of the Steering Committee was reviewed by Dr. Rogan prior to or during the process of its implementation. No decision was final without review by Dr. Rogan and the NIEHS.

6. The NIEHS Project Officer and staff conducted periodic site visits at Kennedy Krieger. These visits were intended to: (1) ensure that Kennedy Krieger was conducting its portion of the study consistent with the trial protocol; (2) review study participant charts to ensure compliance with the United States Food and Drug Administration ("FDA") regulations for investigational new drugs ("IND"); (3) observe Kennedy Krieger's facilities; and (4) survey the residential houses involved in the study.

7. If NIEHS determined during one of these site visits or otherwise, that study matters needed revision or modification, compliance with such a determination was required immediately. For example, I recall during one of the site visits, an observation by Dr. Rogan that it was too noisy in the room where the psychometric testing was being administered. Kennedy

Krieger was required and did immediately move the psychometric testing room to a quieter area of the facility.

8. NIEHS was the owner of the IND exemption for the study drug, Succimer. Dr. Rogan conducted quizzes to make certain that Kennedy Krieger staff involved in the TLC study understood the nature of the drug, including its side effects, in order to ensure compliance with NIEHS and FDA reporting requirements.

9. In the TLC study, the United States Centers for Disease Control and Prevention ("CDC") conducted the laboratory analysis of all blood lead samples from study participants. Accordingly, it maintained oversight responsibility for all issues related to drawing blood at the Clinical Centers. The CDC established the protocol used by all Clinical Centers for drawing blood as well as for packaging the blood samples for shipment to the CDC laboratory in Atlanta, Georgia. Prior to the implementation of the TLC study, the project manager for each clinical site was required to attend CDC training and was then expected to train personnel responsible for obtaining blood samples. This training provided instruction for compliance with the CDC protocol. The CDC conducted site visits to ensure that the Clinical Centers were complying with its blood drawing protocol. The CDC also provided certain of the equipment utilized in drawing the blood samples as well as all of the packaging materials.

10. Kennedy Krieger was required to obtain IRB approval of the Informed Consent Form to be utilized in enrolling study participants. After the local IRB utilized by Kennedy Krieger approved a form, Kennedy Krieger was required to submit that form to the NIEHS IRB for further review. The NIEHS IRB initially rejected the Kennedy Krieger form because it felt that the reading level required for comprehension was too high. Only after Kennedy Krieger

revamped its form, secured local IRB approval again, and resubmitted the revised form to NIEHS was it approved such that the study could proceed.

11. In order to ensure uniform implementation of the TLC study protocol, NIEHS required all Clinical Centers to participate in central training sessions to learn NIEHS approved techniques for measuring the height, weight, head circumference and blood pressure of study participants. These were all values required to be obtained as part of the study. Further, instruction was provided as to NIEHS approved methods for administering relevant psychometric testing, the results of which would be crucial to analyzing the outcome of the study.

12. Kennedy Kreiger's ability to enlist the participation of other institutions in the TLC study was limited by NIEHS. For example, Kennedy Krieger had secured the assistance of the University of Maryland and the Johns Hopkins University School of Medicine as co-clinical centers for the study. In order to enter into a contract with those institutions, however, Kennedy Krieger was required to obtain approval from NIEHS for each and every term contained in the subcontract.

13. When conducting the TLC Study, Kennedy Krieger was obligated to follow, and did comply with, the strict and comprehensive requirements issued by the federal government regarding research involving human beings.

14. Based on my personal involvement and observation of virtually all aspects of the design and implementation of the TLC study at Kennedy Krieger, there is no question that the federal government, through the NIEHS and CDC, retained and exercised a very detailed level of control over every aspect of this study.

**I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: April 19, 2007

Merrill C Brophy

Merrill Brophy